BROWN *plff. in equity vs.* HAVEN *& als.*

W. and H., two of four defendants in equity, demurred to the bill, because several independent causes were alleged therein, in which they averred they had no interest or concern. But the demurrer was overruled, it appearing by the bill, that W. was concerned in all the causes assigned, and that H. was charged with having combined and confederated with the others to defraud the plaintiff, in relation to the subject matter of the controversy. *Relief* may be had distributively, as the equity of the case may require.

S. and F. demurred to the bill, because B. was not made a party. As, however, B. was but the servant of the plaintiff, and not otherwise interested, the demurrer was overruled.

They further demurred, because the bill was exhibited for distinct causes, which had no relation to, or dependence on each other, and which concerned divers and distinct persons, who had no common interest therein. But the demurrer was overruled, it appearing to the Court, that the specifications in the bill had relation to one subject matter, in which all the defendants are alleged to have been combined and concerned, to the prejudice of the plaintiff.

Though *parol* testimony is not admissible to vary the terms of a written contract, in equity, any more than at law, yet it is admissible to prove and locate the boundaries and monuments in a deed, and these being proved, an ambiguity latent in the deed, may become apparent, the description being inconsistent with itself; whereupon the Court will proceed to deduce the *intention* of the parties

THIS was a Bill in Equity, an abstract of which, with the answers of the defendants, was as follows, viz:

The plaintiff in his bill alleges, that on the 7th of *August*, A. D. 1826, he contracted with *Samuel Haven, Andrew Foster, John Foster*, and *Thomas Foster*, through *Wm. C. Whitney*, their agent, to purchase of them a certain tract of land, described in their bond of that date, on the conditions therein specified, which bond makes a part of said bill, — that, it was his design to purchase, and their design to sell, lot No. 5, 2d Range, new survey, by bounds and monuments, shown him by the said *Whitney*, at the time of making the contract, — that, these boundaries were a hemlock tree, as the north-east corner of the tract — thence on the old line, bearing to the north-west, to *Hogan pond* — thence up by the east side of said pond to *Samuel Brown's* land — thence north-east on said lot to *Simon Staples'* land — thence north-west to the first mentioned bound, being the hemlock tree aforesaid, — that said *Whitney* pretended to be well acquainted

with the boundaries of said tract, pointed out an old line, running nearly north-west, as the true line thereof, and that confiding in this representation, he contracted to purchase said tract: That the principal value thereof was the pine timber, — that, he, the plaintiff, informed *Haven* and the *Fosters*, through *Whitney*, that he intended to pay for the land by cutting and selling said timber, — that, said *Whitney*, as an inducement for the plaintiff to make the purchase, then consented that the plaintiff might cut and carry away said timber, at his pleasure, to enable him to pay for the tract, — that, in pursuance of said license, the plaintiff, with one *David Bolster*, his servant, did cut and carry away a quantity of said timber, within the bounds of said tract, as shown by said *Whitney*, — that the said *Haven* and wife and the said *Fosters*, moved by the misrepresentations of said *Whitney*, or other evil minded persons, representing that the plaintiff had actually cut timber on No 5, 4th Division, and without the boundaries of his purchase, pretending that the course from said hemlock tree was *south-west*, where the plaintiff says there was no old line, thereby diminishing the tract purchased to less than 70 acres, did, on the 28*th* of *Sept.*, A. D. 1829, sue out a writ and commence an action of trespass against the plaintiff and said *Bolster*, returnable at the *Oct.* Term of the Supreme Judicial Court, and now pending in said Court, which writ and the proceedings thereon make a part of the plaintiff's bill. That, at the *October* Term of said Court, in *Oxford* County, the action was tried and a verdict returned in favor of the said *Brown* and *Bolster*, which, at the next *May* Term, was set aside and a new trial granted, in consequence of the admission of illegal evidence ; that, previously to the trial, *William Bradbury, Esq.* was, by consent of the parties, appointed surveyor, to run lines, &c. and return a plan, which was done, — and the plaintiff asks that said plan be taken as a part of his bill. That it appears by the plan, that a line, before unknown to the plaintiff, was found, different from the one alleged by *Whitney* as the true line of the tract purchased, according to the new survey, which new survey *Whitney* said he helped make, — that said *Bradbury* discovered another line, marked on said plan, alleged, by said *Whitney*, to be the side line of said lot, and that referred to as running south-westerly

from said hemlock to said *Hogan pond.* That, after said verdict was set aside at the *Oct.* Term of said Court, A. D. 1831, it was proposed to the plaintiff, in order to end all controversy between the parties, that a person, disinterested, unprejudiced, having formed no previous opinion, be appointed by Court, to mark the boundaries of said lot No. 5, according to the new survey on the face of the earth, and ascertain, if any, what quantity of timber the said *Brown* and *Bolster* had cut, prior to the commencement of said action, without the boundaries which said surveyor should mark out and establish as the boundaries of lot No. 5, according to the new survey, extending the boundaries of said lot to *Hogan* pond, — that the plaintiff consented to the appointment, being equitably disposed, and relying on said *Whitney's* assertion, that he helped run the head line of said lot, discovered by said *Bradbury* as aforesaid, and supposing that the said line, running to *Hogan* pond, might be the side line of said lot, — that, said *Whitney* and the attorney of the plaintiff proposed *Uriah Holt, Esq.* for said appointment, and being persuaded by *Whitney* and the plaintiff's counsel, and "urged by the Court," the plaintiff consented, assured of said *Holt's* ability, integrity and impartiality. That said *Holt* undertook to act under his appointment, but to the plaintiff's astonishment and subversion of his rights, at the suggestion and under the influence and control of said *Whitney*, marked the head line of said lot in a place where no line was ever before run or marked, and no bounds or monuments indicating a line, and at a little distance from *Hogan* pond, thereby making a location of said lot totally different from any thing before pretended, giving but a small tract of land, upon which there was very little, if any, pine timber, (the great object of the plaintiff in purchasing) which tract so bounded, was and is nearly worthless, compared with the price paid — against the earnest remonstrances of the plaintiff, — that said *Holt* returned a plan of his doings, which, together with his doings, the plaintiff prays may be made a part of his Bill.

That, the defendants, and said *Whitney* and *Holt* combined to injure the plaintiff, to take his money without an equivalent, or else the defendants lending themselves to said *Whitney*, to take away the property of the plaintiff without an equivalent, deceiv-

ed the plaintiff, to induce him to give a great sum of money for what was of trifling, if of any value, in the following particulars :

1. In showing him an old line, running from said hemlock tree north-westerly to the *Hogan* pond, as one line of the tract which the plaintiff contracted to purchase.

2. In bringing an action of trespass against him, to recover damages for cutting timber on said land, after giving him express liberty so to cut.

3. Pretending and alleging that the lines, discovered and marked in *Bradbury's* plan, were the true lines of said tract, without intimating that there was any other actual or supposed lines or line of said tract, whereby the plaintiff was induced to agree to the appointment of a surveyor to locate said lot No. 5, new survey.

4. That said *Holt*, without the plaintiff's knowledge, previously to his appointment as surveyor, had been, by direction of said *Whitney*, acting as agent and attorney as aforesaid, taken unto said lines in company with *Whitney*, examined the same, and made up an opinion on the subject matter of his appointment, and this was well known to *Whitney*.

5. That said *Havens* and *Fosters*, through said *Whitney*, confederating with said *Holt*, to injure and defraud the plaintiff, caused *Holt* to locate said tract by metes, bounds and lines, where none existed before, or were supposed to exist by any one.

6. That the plaintiff never understood there was any denial that said hemlock tree was one corner of said tract, but that the only dispute was, whether the line should run north-westerly on said old line from the hemlock tree, or south-westerly from said tree, where was no line, to *Hogan pond,* — that, the question to be submitted to said *Holt*, was, whether the said tract should be located according to the old line, as shewn to the plaintiff when he made the contract, according to the line discovered and marked by said *Bradbury*, on his plan returned.

7. That the agreement to cause said tract to be located and marked by *Holt*, as executed by *Holt*, is inequitable, unconscionable, and ought not to be enforced.

8. That the plaintiff has ever tendered to *Whitney*, the defendants' Agent, the several payments for said land, as they fell

due and requested him to give up the notes given for said land, — but *Whitney* refused to accept the money, or give up the notes — that, the plaintiff has always been and is ready to pay up said notes and receive a deed of said land according to the true meaning of the bond.

The bill concludes with a prayer, that said *Haven, Fosters, Whitney* and *Holt,* may be summoned and held to answer in equity — that said *Haven* be compelled to disclose the amount due on said notes, to receive pay therefor and give the plaintiff a deed in conformity with the conditions of the bond — that they be enjoined against any further proceedings against the plaintiff in said suit — that the agreement to appoint *Holt* be annulled and his proceedings set aside — and that the said *Havens, Fosters, Whitney* and *Holt* be held to answer truly and definitely to all the matters alleged in the bill.

*Whitney* and *Holt,* two of the respondents, demur, because it appears by the bill that distinct and several causes are exhibited therein, which have no relation to a dependence upon each other, wherein these defendants have no interest, nor are in any way concerned, whereby these defendants are perplexed and unjustly put to expense and trouble. For which reasons and divers other errors and imperfections in said bill appearing, these defendants demur thereto and pray judgment, whether they shall be required to answer further, and that they be dismissed and for their costs.

Said *Whitney* also answers, that on the 7*th* of *August,* 1826, as agent of *Haven* and others, he contracted to sell said *Brown,* lot No. 5, 2d Range, in *Hebron,* new survey, — containing one hundred acres more or less — beginning at a certain hemlock tree — thence by a south-west course on the old line to *Hogan* pond — and thence by other courses described in said contract, to the beginning — which contract was delivered to said *Brown,* and which he prays he may be required to produce, to ascertain whether it is truly set forth in the bill, — that said *Whitney,* a long time then past, had some knowlege of the location and situation of said land, — but had not nor did he profess to have, any particular knowledge of the lines or corners of said lot No. 5 — but that said *Brown,* living near the same, did profess to know with certainty the boundaries thereof, — that *Brown* said he

wished to purchase No. 5, which *Whitney* agreed to sell him at $8 per acre—said lot No. 5, as originally located and surveyed, was the only subject of said contract. *Brown* told *Whitney,* that he well knew the bounds and conducted *Whitney* to said hemlock tree, declaring it the north-east corner of No. 5. *Whitney* replied, that if it were so, the course would be south-west from that tree to the pond—they accordingly marked the tree, *Whitney* relying wholly on the declarations of *Brown,* as he did not pretend to be well acquainted with the bounds, though he knew the lines ran south-west and north-east, and at right angles with the same—that he did not then, or at any other time, shew *Brown* any old or new line running nearly north-west, nor in any northerly or westerly direction from said tree as the line of said lot, nor was any such line spoken of between them as the line of said lot then, or at any time—the only line or course spoken of was, the old south-west line of said lot, which *Whitney* told *Brown,* and supposed, would probably be found in a south-west course from said tree to the pond, if said tree, as *Brown* represented, was the north-west corner.

That *Brown* did not inform *Whitney* how he expected to obtain the money to pay for the land, nor what were his inducements to purchase it, nor did *Whitney* ever give *Brown* license or consent to cut and take away the timber thereon, nor would he have been willing to sell *Brown* all the timber on the credit mentioned in the bond, or upon *Brown's* personal security—had such been his intent, he should have given a deed instead of a bond to convey the land.

That said *Brown,* as *Whitney* believes, with intent to defraud the owners of the land, after the execution of the bond, falsely pretended, that the line of the lot ran north-west from said tree, by some trees found marked, extending in a crooked line, by various courses, between north and west, towards the outlet of the pond, probably marked as a hunter's line, a wood road, or for some such private purpose, which would include nearly three times the quantity of land which *Brown* contracted for—and further falsely pretending that *Whitney* had shown him said north-west line as the true line of said lot, and that said *Brown,* or some other per-

son, by his procurement or connivance, altered or attempted to alter the word, " south-west," in said bond, into the word, " north-west," insisting it was originally written north-west, and not otherwise.

In farther execution of said wicked intent, said *Brown*, with one *David Bolster*, being admitted to a joint interest in the land, trespassed upon the lands of said obligors, as well beyond as within the limits of said pretended north-west line, and also within and beyond the true lines of lot No. 5, by cutting and carrying away the timber thereon, for which trespass the owners sued *Brown* and *Bolster* at law, the suit still pending for judgment in this Court, to the records and files whereof *Whitney* asks leave to refer. That before the commencement of the suit, *Whitney*, by his agent and attorney, remonstrated with *Brown* on the injustice of his pretended claim and conduct, requesting him to desist, and offered, if there were any mistake in the description of said lot in the bond, to make it correct according to the true bounds, as they might afterwards be discovered ; and at all events to make up and convey to him the full complement of 100 acres : to which *Brown* refused to accede — saying he would have all the land within the " north-west line or none." *Brown* thus refusing to listen to any offers of accommodation, the owners were obliged to resort to law.

When *William Bradbury, Esq.* discovered and marked on the plan mentioned, a line running a north-west and south-east course and crossing between said hemlock tree and the pond, *Whitney* supposed it might be the true head line of the lot, but does not recollect that he asserted it was so. But *Brown* positively declared that he knew that it was not the line of said lot — that it only partially crossed the lot and that it was made for some private purpose. *Brown* made a like assertion relative to some marked trees extending in a south-westerly direction from said tree, for a few rods, but not standing near it, which trees *Whitney*, never to his recollection, asserted to be on the side line of the lot, though he thought them to be so, being deceived by *Brown's* false assertion that said hemlock tree was the corner.

That, at the *May Term* of this Court, A. D. 1832, and not at the *October Term*, as stated by *Brown*, said cause came on for

trial, when the plaintiffs renewed their overtures to *Brown* for a
just and amicable compromise, again offering *Brown* a deed of
100 acres; which he refused, still insisting that the hemlock tree
was the corner, that there was a line which was the true line of
the lot referred to in the bond, extending west, or a little southerly
of west, from said tree to the pond, and that he should succeed in
establishing it at the trial.    It was therefore proposed by one of
the plaintiff's counsel, and assented to by *Whitney*, that a disin-
terested and competent surveyor be appointed to run out, ascer-
tain, locate, mark, and establish the lines and bounds of the lot,
(No. 5, 2d Division) and that the lot so ascertained should be
taken and deemed to be the lot mentioned in said bond; and that
the same surveyor should also ascertain the amount of damages,
if any, done by *Brown* and *Bolster*, for their trespass aforesaid,
beyond the limits of said lot so ascertained, for which amount
judgment should be entered in said action.    The proposition ori-
ginated with the plaintiff's counsel aforesaid, not with *Whitney;*
but made with his assent and was committed to writing, as is spe-
cially set forth in the same on file in said action.    The proposal
was taken out of the Court room by *Brown* and *Bolster*, and
their counsel, and after being amended and interlined at their sug-
gestion, was by them accepted.    And this defendant says, that
the counsel for *Haven & als.* being asked by the counsel for
*Brown* and *Bolster*, to name a surveyor to perform the service,
named *William Bradbury, Esq.* and urged his appointment, to
which *Brown* and *Bolster* refused to assent; and they being then
requested by the counsel of *Haven & als.* to name a surveyor,
did of their own mere motion, nominate *Uriah Holt, Esq.*, to
whose appointment, not without some objection, the counsel for
*Haven & als.* assented : that said *Holt* was never nominated or
proposed by him or by *Haven & als.* or their counsel, nor by any
one else on their behalf, to his knowledge or belief, but by said
*Brown* and *Bolster*, or their counsel, — that said *Holt*, never to
his knowledge or belief, previously examined the boundaries of
said lot, or formed any opinion respecting the same : that, once
in the autumn of 1830, he went with *Whitney*, to find an old
line, which, it was said, would be crossed by a course south-
west from the hemlock tree, and for no other purpose than to

run said course, and assist in finding said line — without examining any thing else about said lot, or forming or expressing any opinion relative to the location of it, — that this is all the knowledge, as *Whitney* believes, said *Holt* had of said lot, previously to his appointment ; nor did *Whitney*, then or at any time previous to *Holt's* appointment, make any representation as to the true location of said lot — the lines, &c. of the lot had been so differently represented by *Brown*, and by the plan taken in the cause, that *Whitney* was uncertain where they would be established ; some persons supposed the lot did not extend to the pond — and *Brown* would not consent to the proposal aforesaid, unless *Whitney* would, at all events, grant him the land extending to the pond, whether it should fall within the limits of No. 5, or not, to which, unreasonable as it was, *Whitney* consented, and the agreement was interlined and altered accordingly ; whereupon said *Holt* performed the service at the request of all the parties, made a report and plan now in Court, and referred to as part of this answer. This defendant further says, that he never by himself or agent, directly or indirectly attempted to influence or control said *Holt*, in any way relative to the performance of the duties of his appointment, except in the usual way of evidence and argument at an open hearing of both parties by him appointed, — that it was the mutual understanding of both parties, that the whole subject of the location of said lot should be left at large to said *Holt*, to decide absolutely between them, without regard to any thing other than what appeared in the agreement aforesaid, — that it was never intended that he should bound said lot by said hemlock tree, unless he should find it had been originally so located, — that this defendant never supposed said tree to be the corner, after *Bradbury's* survey and some time before, but he believes it was not, and that *Brown* wilfully deceived him therein ; and solemnly avers, that to the best of his knowledge and belief, the location of said lot, as ascertained and reported by *Holt*, is the true, original, actual location of the same, — that said *Holt* was not influenced by any sinister motives in his doings, but acted uprightly, according to the true intent of said agreement, and upon legal evidence and in the exercise of sound and legal judgment and discretion. He further avers, that he never

wilfully misrepresented any fact respecting said lot to *Brown* or *Bolster* — nor used inducements or persuasions to them to enter into said agreement, other than the general motive of making an end of disputes, both as regards the trespass and the meaning of the bond.

That it was never understood between him and *Brown* and *Bolster,* nor had they reason to believe or understand that the only dispute between them was whether the true course was north-west or south-west from said hemlock tree, nor whether said lot was to be located by the lines shewn by said *Whitney,* or discovered by said *Bradbury* — nor does he believe *Brown* so understood, — on the contrary, said *Whitney* did not shew *Brown* any lines of the lot, and it was well understood between them, that the whole location of the lot, except the south-east side, was in dispute and uncertain; that *Holt* was to ascertain the same, and that they were to be bound by his location, fall where it might, without reference to any previous transactions.

That said *Brown,* at some time tendered money to him, professing thereby to comply with the conditions of said bond on his part, and coupling said tender with a demand of a deed of said lot, by a course north-west from said tree, as the condition of the payment so tendered; which he refused to receive because of the condition annexed to the tender, because of the illegal nature of the money tendered, and because it was not sufficient in amount — that, there is due from the obligees to the obligors, if they are obliged to receive it, the sum of $768,62, *March* 24, 1834, — that the price agreed to be paid by *Brown* for said lot, is reasonable and fair, — that *Brown* always professed to be well acquainted with its location and value, — that the agreement to refer said matter to said *Holt,* was equitable, reasonable and fair; as much for the benefit of *Brown* and *Bolster* as of the other parties, — that this defendant has no interest in the subject matter of the said contract or suit on the plaintiff's bill, — and he denies all conspiracy, confederacy, intent to deceive or injure, and unreasonable advantage wherewith he is charged in said bill — and prays to be hence dismissed with his reasonable costs.

*Uriah Holt,* one of the defendants, not waving his demurrer but insisting thereon, answers, that as to any matters stated in the

plaintiff's bill, to have been transacted between the plaintiff and *Wm. C. Whitney,* and as to the allegations therein, relative to the proceedings in the suit mentioned, before the time of his appointment as surveyor and referee therein, he knows nothing except from common report.    That in the autumn of 1830, he was requested to meet *Whitney* at the new mills, so called, with his compass — which he did, and by *Whitney's* request went with him to said hemlock tree, and ran a course south-west from the same, to see if such course would cross a supposed old line between that tree and *Hogan* pond ; and they found that it did. But *Holt* did not examine any other lines or boundaries, nor make any search for the lines or bounds of lot No. 5, nor was he informed by *Whitney* or any other person how the lot was bounded, nor did he ever form any opinion respecting it previous to his appointment aforesaid, that he supposed himself called upon merely in the exercise of his profession as a surveyor, to run the south-west line and assist in ascertaining whether it would cross any old line whatever, and when it was ascertained that it did, his service on that occasion was ended, — that he knew not what line it was, and was not called upon to explore it but returned home, never expecting to be again called upon in relation to the lot.    That, this was the first and only time he was ever on the lot, till he went as referee, after notice to the parties, *to ascertain* the bounds of it.    That, at the time of his appointment as referee, and of his entering on the duties of his appointment, he had not formed any opinion respecting the location of the lot, that he stood wholly unbiased, uninfluenced, and indifferent between the parties, — that, neither these defendants, nor any one else in their behalf, ever attempted, directly or indirectly, to influence his judgment, or affect his decision upon the matters submitted to him, other than by the evidence and arguments laid before him in the presence of *Brown,* and at an open hearing of the cause : that, in ascertaining the true location of the lot, he explored the whole neighboring region, lines and corners, over many lots on all sides of the same, exercised his best skill and judgment as a surveyor of many years experience, and decided wholly upon the evidence of his own senses, and upon such other evidence as the parties laid before him in the presence of each other, in the usual

and ordinary course of proceedings in such cases, without any prejudice or sinister influence whatever; that, he patiently heard all the evidence and arguments offered by either party, and carefully considered it — and that he verily believes he has ascertained and reported the bounds of the lot, according to the true original location.

And this defendant denies that he has any interest in the subject matter of the bill — and further denies all the conspiracy, &c.

*Samuel Haven* and *John Foster*, two of the defendants, demur to the plaintiff's bill, because *Wm. C. Whitney* and *Uriah Holt* are made defendants, who by the plaintiff's own shewing, have no interest in the subject matter thereof, but are material witnesses for these defendants, — and as to that part of the bill that relates to the action of trespass, these defendants demur, because it appears by the plaintiff's own shewing, that *David Bolster* is not a party to the bill, as he ought to have been in seeking relief against that suit. They further demur, because the bill is exhibited for distinct causes, which have no relation to, or dependence on each other, and which concern divers and distinct persons who have no common interest therein.

They further answering, say, that said *Whitney* was their agent in the management and sale of their lands in *Oxford* County, at the times mentioned in the bill, — that all the knowledge they have of the transaction, has been derived from *Whitney* and from their counsel, — that their instructions to *Whitney* went only to the general and faithful care of their interests, and a fair sale of their property, but were not of a character to make it the interest of *Whitney* to deal otherwise than justly and fairly with any person, or to deceive any one in the quality, quantity, or value of any portion of their lands, or to make a hard bargain for the same, nor had he any direction or intimation from them so to do, nor have they any reason to believe that he did so, — that said *Whitney* or *Holt* never had any interest in the bond, contract or suit mentioned in the bill.

These defendants further say, that they have been informed by *Whitney*, and verily believe, that he contracted in their behalf with *Brown*, to sell him lot No. 5, in the 2d Range, in *Hebron*,

according to the new survey, so called, — that *Whitney* entered into a written contract for the sale thereof, now in the hands of *Brown*, which they pray he may be required to produce, — that the conversation between *Whitney* and *Brown* was wholly of a sale of lot No. 5, however bounded, containing one hundred acres at $8 per acre, which *Brown* represented to be bounded as described originally in the bond, viz. by a course due south-west from the hemlock tree to the pond; that after the execution of the bond, *Brown*, or some other person, altered or attempted to alter the word "south-west" into the word "north-west," in order that *Brown* might seem to have purchased nearly three times the quantity of land bargained for, — that *Brown* pretended he had purchased by a line running north-west from the hemlock tree, which, in fact, was never agreed upon nor mentioned between him and *Whitney*.

They further answer, that they never, at any time, gave *Brown* liberty or license to enter said lot or any other of their lands, and cut and take timber therefrom, but that *Brown*, without license from either of these defendants, did enter upon the lands of these defendants and others, and cut and take away large quantities of timber growing thereon, for which he and one *David Bolster*, his co-trespasser, were sued in trespass, as to which suit and the proceedings therein, these defendants refer to the records of this Court. They further say, that after it was discovered that a south-west course from the hemlock tree would not give *Brown* one hundred acres of land, they were willing, at all times to make up to him, that quantity out of their adjoining lands, if he would have accepted the same, notwithstanding they were not bound so to do by the language of the bond, and by their agent repeatedly offered it, but *Brown* refused every such offer, unjustly insisting upon the north-west course aforesaid.

And they utterly deny all the conspiracy, confederacy, &c.

There was a mass of evidence confirmatory of, and adverse to, the bill and answers, which, perhaps, is sufficiently noticed in the opinion of the Court.

*Fessenden* and *Daveis*, for the plaintiff, claimed to have *Holt's* report set aside, because, 1. he had no power to make a *new* line

for lot No. 5. He was to locate the lot according to a *new survey*, but he had no power to make a new line.

2. Because the plaintiff was under an entire misapprehension as to the terms of the agreement under which *Holt* run out the lot. They adverted to the proof in the case to show it, and claimed relief on the ground of *mistake*. 1 *Mad. Ch.* 75, 78, 296; *Jeremy's Eq.* 494; *Brown* v. *Brown*, 1 *Vern.* 157; *Morgan* v. *Mather*, 2 *Ves. Jr.* 15; 2 *B. & B.* 120; 6 *Ves.* 337; 1 *Ves.* 318; 2 *Atk.* 33, 203; 2 *P. Will.* 70; *Jeremy's Eq.* 255, 384, 456; 1 *Mad.* 255; 1 *Chit. Gen. Pr.* 833; *Newland on Con.* 156, 213, 214 to 227; 2 *Dow & Clark*, 463.

*Greenleaf*, for the defendants, cited the following authorities: *Coop. Eq.* 20, 42; *Mitford's Pl.* 12, 45; *Plummer* v. *May*, 1 *Ves.* 426; 2 *Johns. Ch.* 550; 1 *P. Will.* 596; 1 *Johns. Ch.* 246; 6 *Johns. Ch.* 201; 2 *Cowan's Rep.* 139; 2 *Mad.* 416; 7 *Ves.* 287; 1 *Johns. Ch.* 73; 2 *Stark. Ev.* 766; 1 *Johns. Rep.* 576; 2 *Atk.* 228; 1 *Vern.* 230.

WESTON C. J. delivered the opinion of the Court.

*William C. Whitney* and *Uriah Holt* demur to the plaintiff's bill, because several independent causes are alleged therein, in which they aver they have no interest or concern. But *Whitney* is charged in the bill with being concerned in all the causes assigned; and *Holt* is charged with having combined and confederated with the others to defraud the plaintiff, in relation to the subject matter of the controversy. How far these allegations may be sustained, is not a question upon demurrer. But if sustained, they are sufficient to justify the insertion of these defendants as parties. Relief may be had distributively, as the equity of the case may require, according to the gravamen made out against the defendants.

*Samuel Haven* and *John Foster* demur, because *Whitney* and *Holt* were made parties, which we hold justified for the reasons before stated; and because *Bolster* was not made a party. As however he was but the servant of *Brown*, and not otherwise interested, we think his omission cannot prejudice the defendants. They further demur, because the bill is exhibited for distinct

causes, which have no relation to, or dependance on each other, and which concern divers and distinct persons, who have no common interest' therein.   But it appears to us, that the specifications in the bill have relation to one subject matter, in which matter all the defendants are alleged to have been combined and concerned, to the prejudice of the plaintiff.   We adjudge the causes of demurrer to be insufficient; and the demurrers are accordingly overruled.

Proceeding to the consideration of the bill, answers and proof, we are of opinion that the plaintiff has failed to sustain his bill against *Holt ;* who is discharged and allowed costs.

The testimony of *Holt* and *Whitney* is objected to as witnesses, at least without the previous order of a Judge ; and upon this point several authorities have been cited.   As, however, their testimony does not affect the case, in the view we have taken of it, we deem it of no importance to decide upon its admissibility.

From the bill, answers and evidence before us, it may be important to determine, if we may, what tract of land *Haven &* *als.* through their agent *Whitney,* intended to sell to the plaintiff, and what tract he intended or expected to purchase.   And this does not appear to us to be a question of very great difficulty, notwithstanding the conflict in the testimony, and the discrepancy between the bill, and the answer of *Whitney,* as to some of the facts.

He insists, that he doubted whether the hemlock tree was the true corner of the lot, and that it was marked as such, and adopted in the bond, from the assurance of the plaintiff that it was so. The course thence to *Hogan* pond has been in controversy — a question having been raised as to the true reading of the bond, in describing this line.   But as to how far' the tract was to extend in other directions, the bond is express ; and there does not appear to have been any misunderstanding between the parties ; whether they can be reconciled or not, with another part of the description.

The land was to run to *Hogan* pond.   It was to run thence, on *Samuel Brown's* line, to *Simon Staples'* land.   It is not pretended, nor is there any evidence, that *Whitney* was led into any error by the plaintiff, in this part of the description.   The lot

agreed to be sold them, was to run from *Hogan* pond to *Staples'* land. It is also described, as lot number five, in the second range, according to the new survey. Both parties supposed that this would coincide with the other boundaries given. *Staples'* land was one of the pigeon hill lots. The parties then must have supposed, that the line of these lots was the head line of number five in the second range. There is reason to believe, however, from the survey made by *Holt*, and other evidence in the case, that the head line of lot number five, in the first range, bounds on the pigeon hill lots. And *Samuel Brown's* land runs through the first and second ranges.

The cause of the error, into which both parties fell, undoubtedly was, that the line between the first and second ranges, in that neighborhood, not having been marked, number five, in the second range, was supposed to run to the pigeon hill lots. Hence the lot was to run to *Staples'* land, which was one of those lots. With this impression, it is very clear, that there was a mistake in selecting the hemlock tree as the north-east corner; for a south-west course thence to the pond, would pass about through the centre of number five, in the second range. It was in the line of the pigeon hill lots; but was not so far north as the side line of five, in the first range, which was an extension of the side line of five, in the second range. Where that line, namely, the north line of number five in the second range, extended, would strike the line of the pigeon hill lots, was the true north-east corner of the tract, which the one party intended to sell, and the other to purchase. For there is no doubt as to the width of number five, at the pond, and the line thence was to be continuous, running a north-east course.

The foregoing deduction, as to the intention of the parties, is not opposed to the principle settled in *Elder* v. *Elder*, 1 *Fairf.* 80, that parol testimony is not admissible, to vary the terms of a written contract, in equity, any more than at law. Parol testimony is admissible, to prove and locate the boundaries and monuments given in a deed, and these being proved in this case, an ambiguity, latent in the deed, became apparent; the description given not being found consistent with itself; so that the mistake

is satisfactorily proved, by an exception to the rule before cited, and which is as well settled as the rule itself.

The lot, as located by *Holt*, differs most essentially from the boundaries, given in the bond. The latter bounds upon *Samuel Brown's* lot, along his whole north line, to *Staples'* land. The former extends upon that line but about half the distance. The one runs to *Staples'* land, the other stops one hundred rods short of it. The one is bounded on *Hogan* pond, the other runs over and beyond it.

So strong was the impression that number five, in the second range, extended to *Staples'* land, that it was entertained, even after *Bradbury* made his survey, by order of the Court ; and it was not discovered that it did not, until *Holt* had extensively explored the lines and surveys in that part of the country. It is then very apparent to us, that when the plaintiff agreed by his counsel, that *Holt* should locate, mark, and establish lot number five, in the second range, according to the new survey, and that the lot so established, should be taken as the lot mentioned in the bond of *Haven & als.* to him, he acted under a misapprehension, which has led to a result unexpected by both parties; and which does not accord with the justice of the case.

We are satisfied that the land agreed to be sold, as the parties intended, was to bound, the width of number five, in the second range, on *Hogan* pond, and to run thence, within the side lines of that lot extended, to the line of the pigeon hill lots, the whole being supposed to be five in the second range, the line between the first and second ranges not having been there marked, and neither party being aware that the new survey would result in a different location of that lot. The plaintiff in equity insists in his bill, as he did before in the trial at law, and when he claimed a deed of the other contracting party, that by the condition of the bond, the line of his purchase ran from the hemlock tree, a north-west, instead of a south-west course to *Hogan* pond ; but we are of opinion, that south-west is the true reading of that course, in the condition of the bond ; and there is, in our judgment, no satisfactory proof, that north-west was the course intended.

*Whitney,* the agent of *Haven & als.,* states that he considered himself bound to resist this assumption, which we deem unwarrantable, but that he was always ready to correct any mistake, and to do what is equitable and proper; and he has in their behalf expressed a desire, that the Court would intimate what, in their opinion, the equity of the case requires them to do, and they would conform to it. To meet this liberal proposition, which is all the plaintiff in equity can expect, or is entitled to, we do not hesitate to give the intimation desired, not as an order or decree in the case, but by way of recommendation, with a view to an arrangement between the parties. We are of opinion then, that the plaintiff in equity ought to pay to *Haven & als.* whatever remains unpaid of the sum of eight hundred dollars, which he agreed to pay, with interest, and that *Haven & als.* should thereupon convey to him, by a good and sufficient deed of warranty, all the land from *Hogan* pond to the line of the pigeon hill lots, which would be embraced by an extension of the side lines of number five, in the second range, eastward to the line of those lots. That it then be left to *Mr. Holt,* to determine, whether the plaintiff in equity, or any one under him, did before the action of trespass against him, cut any timber from the lands of *Haven & als.* without the bounds of the land last described, and if he did, to ascertain its value. That, thereupon, *Brown* and *Bolster* become defaulted in that action; and that judgment be rendered against them, for the amount thus ascertained, with costs. But if *Holt* find that no timber was thus cut, without the bounds described, that *Haven & als.* the plaintiffs in that action, become nonsuit, and the defendants be allowed their costs. That *Whitney,* as the agent of *Haven & als.* should have made himself better acquainted with the true description of the land he undertook to sell; and therefore, although not interested in the cause, is not entitled to receive costs.

The plaintiff in equity has made out a case calling for relief, yet having pertinaciously insisted upon more than he was entitled to, and having thus set up a claim, which the adverse party was constrained to resist, it does not present a case, in which costs upon this bill ought to be adjudged in his favor. If *Haven &*

*als.* are ready to adjust the controversy upon these terms, it is all the relief the plaintiff in equity can justly claim.

If they decline it, the Court are of opinion, that the plaintiff in equity is entitled to relief, upon the foregoing facts, by way of defence to any action brought against him ; and will enjoin *Haven & als.* to consent to discharge the agreement, to refer to *Holt;* and if, at a further trial of the action at law, it should be proved that their agent gave a license to *Brown,* the plaintiff in equity, to cut timber from the land they agreed to sell him, will enjoin them from prosecuting him, or *Bolster,* who acted under him, as trespassers, for cutting on the land, between the side lines of number five, in the second range, extended easterly, from *Hogan* pond to the line of the pigeon hill lots.